## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO (WESTERN DIVISION)

**IN THE MATTER OF THE SEARCH OF:**

**In the Matter of the Search of information associated with ryanjarcy@gmail.com that is stored at premises controlled by Google, Inc.**

Case No. 3 : 15 MJ 5180

### AFFIDAVIT IN SUPPORT OF

### AN APPLICATION FOR A SEARCH WARRANT

I, David J. Gibson, being first duly sworn, herby depose and state:

### INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Google, Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      Your Affiant is currently employed as a Special Agent with the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI) in Cleveland, Ohio.  I have been so employed since April, 2009.  As part of my daily duties as an HSI Special

3:15 MJ 5180

Agent, I have participated in investigations targeting individuals and organizations involved in drug trafficking offenses in the Northern District of Ohio and elsewhere.

     3.     Your Affiant is an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. The Affiant is also empowered under Title 19, United States Code, Section 1589 to serve any warrant under the authority of the United States and make warrantless felony arrests for any crime against the United States. The Affiant is a Customs Officer as defined by Title 19 of the United States Code, and is authorized to conduct warrantless searches at the United States Border or the Functional Equivalent of the United States Border.

     4.     Your Affiant has received specialized training at the Federal Law Enforcement Training Facility, located in Glynco, Georgia, in regards to the identification of controlled substances and the operation of drug trafficking organizations. As part of my training, I have received specialized instruction about narcotics, narcotics trafficking, money laundering and various techniques for investigating persons and organizations engaged in this unlawful conduct. Your Affiant has participated on search warrants and has executed search warrants which have resulted in the seizure of illegal drugs and evidence of drug violations.

     5.     The facts recited in this affidavit are presented solely for the purpose of establishing probable cause to search for the evidence specified herein. As such, this affidavit does not include every fact known regarding this investigation, but will rather seek to summarize the relevant information concerning this investigation.

     6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 USC Section 545, 21 USC Section 952, 21 USC Section 841(a)(1), 18 USC Section 1956, 18 USC Section 371 have been committed by Danya SCAVO and Ryan JARCY. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## AFFIANT'S KNOWLEDGE

8.     Based upon my training and experience and discussions with other agents and law enforcement officers concerning the distribution of controlled substances, I am aware of the following:

    a.    That drug trafficking on a scale as described herein is an economic crime based on the profits to be earned. Large-scale narcotics traffickers often maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing drug business.

    b.    That persons engaged in drug trafficking commonly conceal controlled substances, currency, financial instruments, precious metals, jewelry, titles to automobiles, and other items of value in their residences, businesses, and automobiles.

    c.    That when drug traffickers amass large proceeds from the sale of drugs, the traffickers attempt to legitimize these profits through various money laundering techniques such as the placing of assets in nominee names, use of legitimate and sham/shell businesses, use of financial institutions, use of wire transmitters, and numerous other techniques. That to accomplish these goals they often utilize domestic and foreign banks and/or financial institutions and their attendant services, securities, safe deposit boxes, cashier checks, drafts, letters of credit, brokerage houses, real estate, "shell" corporations and businesses as "fronts" for their proceeds.

    d.    That narcotics traffickers purchase assets with the proceeds of their unlawful activity and often place these assets in nominee names. Oftentimes, drug

3:15 MJ 5180

dealers place these assets in names of relatives, close acquaintances, or business entities to avoid detection of these assets by government agencies.

e.     That drug traffickers commonly "front" (provide on consignment) drugs to their customers or clients and frequently maintain records of same.

f.     That safes and other concealed compartments are often utilized as locations to store drugs, currency, assets, and other proceeds and evidence of drug trafficking.

g.     That after purchasing controlled substances, traffickers will often transport or have transported these controlled substances to areas where they will distribute the controlled substances. Methods of transportation include but are not limited to commercial airlines, private aircraft, boats and ocean going vessels, rental and private automobiles, government and contract mail carriers.

h.     That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them. Additionally, it is common that all or part of these records are in code and kept at different locations to avoid detection by law enforcement.

i.     That drug traffickers often use slang and/or talk in code when referring to the drug(s) they possess and/or are selling.

j.     That drug traffickers often take, or cause to be taken, photographs or videos of themselves, their associates, their property and assets, and their product and that these photos are usually maintained in their businesses or residences.

k.     That drug traffickers often keep readily available the paraphernalia for packaging, cutting, weighing, and distributing controlled substances and that these items include, but are not limited to, scales, plastic bags, and heat sealers.

3 : 15 M J 5180

l.    That drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes, but is not limited to, computers, hard drives, flash drives, personal digital assistants (PDAs), digital display pagers (beepers), cellular telephones, smart-phones, speed dialers, electronic telephone and date books, money counters, fax machines, and police scanners.

m.    That people who traffic in controlled substances frequently maintain firearms or other weapons to protect themselves, the controlled substances, and the proceeds of the sale of controlled substances on their persons, at their residences, in their automobiles, and/or at their businesses.

n.    That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o.    That drug traffickers commonly have in their possession, that is, on their person, at their residences, in their automobiles, and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Said firearms are used to protect and secure a drug trafficker's property.  Such property may include, but is not limited to narcotics, jewelry, narcotics paraphernalia, books, records, and United States currency.

p.    That drug smugglers utilizing the United States Mail or other package delivery service often utilize fictitious names or names of others not closely associated with them so as to conceal their identity.

q.    That drug smugglers receiving product through the United States mail or other package delivery service will utilize computers with internet connections to order and pay for product smuggled into the United States.

r.    That drug smugglers using the internet to order and pay for product will use darknets, internet sites such as Tor or Silkroad, that have controlled access and require special encrypted software to access them.  This software is typically

$3:15 MJ 5180$

downloaded to a computer and/or mobile computer's hard drive and/or internal data storage.

s.     That drug smugglers using the internet to order and pay for product will use online payment channels derived in United States and 'virtual' currency; for example, PayPal and Bitcoin. The software for these platforms are typically accessed online via the computer and/or stored on the computer itself in 'wallets' making the computer itself the holder of virtual currency similar to a safe holding a cash hoard.

t.     Affiant has personally worked on previous investigations in Detroit, Michigan with the Inspector General Office of the U.S. Food and Drug Administration in which controlled substances were being laced into products marketed as athletic and/or weight loss supplements. Affiant is also a certified EMT since July of 2013 and also has knowledge that Methylenedioxypyrovalerone (MDPV) is a central nervous system stimulant which could have the effect of speeding up the metabolism.

## CRIMINAL INVESTIGATION

9.     On March 12, 2015, United States Customs and Border Protection (CBP) officers assigned to the John F. Kennedy International Airport Inspection Facility inspected an express mail parcel from China bearing parcel number EE934217023CN. The John F. Kennedy International Airport, International Mail Inspection Facility is one of several sites where international mail enters the commerce of the United States. The International Mail Facilities are the first point of entry for mail entering the United States and as such are the Functional Equivalent of the United States Border. CBP Officers are authorized by United States law to conduct warrantless searches of mail at the United States Border and/or the Functional Equivalent of the United States Border.

10.     CBP officers noted that the parcel was shipped from 'Marry' (Last Name Not Indicated), in China to a consignee identified as Kaylin Plontz at ▮▮▮ Mandell Road, Perrysburg, OH 13551. CBP/JFK Officers conducted an inbound examination of the parcel and

3:15 MJ 5180

found that it contained 1.02 kilograms of white powdery substance inside of a foil pouch. CBP/JFK Officers field tested the substance and found that it tested positive for Methylenedioxypyrovalerone (MDPV; street name 'Bath Salts'), Schedule I. Based on the above facts, the parcel was seized based on a violation of Title 21, United States Code, Section 952 (Importation of a Controlled Substance).

11.     On March 26 & 27, 2015, an HSI Intelligence Research Specialist conducted research through open source and law enforcement databases with the following findings.

- a.  Kaylin Marie PLONTZ (DOB ███████, SSN: ████████) is issued Ohio Driver's License number ████████ The address listed on Ohio Driver's License number ████████ is ████ Mandell Road, Perrysburg, Ohio 43551. PLONTZ has no criminal history.

- b.  Three (3) prior imports were delivered to 9642 Mandell Road, Perrysburg, Ohio 43551.

  - i.  August 05, 2014: One (1) parcel weighing zero (0) kilograms and manifested as 'clothes'. The exporter was listed as Xin Ren Trade Co Ltd. Country of export: China. The final consignee of the package was listed as Stephen HANSEN, later identified as PLONTZ'S husband (see paragraph 11).

  - ii.  January 26, 2015: One (1) parcel weighing two (2) kilograms and manifested as 'halbach array'. The exporter was listed as Bright Fusion Ltd. Country of export: Great Britain. The final consignee of the package was listed as TONY SCAVO. Affiant has since learned that TONY SCAVO is married to Kaylin PLONTZ's mother, DANYA SCAVO.

  - iii.  March 11, 2015: One (1) parcel weighing one (1) kilogram and manifested as 'proline'. The exporter was listed as 'Suzhou Lto Trade Co'. Country of export: China. The final consignee of the package was listed as International Commodities Supp(ly).

3 ́ 15 M J 5180 ı

u.    Your affiant searched International Commodities Supply through the Ohio
Secretary of State business filing portal; no business and/or incorporation
filings by that name were located.

v.    Further research was conducted regarding the above-mentioned exporters and
eight (8) prior imports of seized controlled substances were discovered for
which the exporter was listed as the Suzhou Lto Trade Co. in China.  The
following is a summary of the seizures:

i.    On October 25, 2014, CBP Officers in Los Angeles, California inspected a
package destined for an address in Kent, Washington.  The package
originated from the SUZHOU LTO TRADE CO. LTD at address Room
1818 I Zhoungliang Xiangt I, Suzhouhuqiu Juangsu, China.  The shipment
was manifested as 'Epoxy Resin'.  CBP's examination of the shipment
yielded a plastic bag containing a tan colored substance.  A sample of the
substance was tested by the CBP laboratory and tested positive for
Ethylone, Schedule I.  The net weight of the substance was 514 grams.

ii.    On October 30, 2014, CBP Officers in Los Angeles, California inspected a
package destined for an address in Miami, Florida.  The package
originated from the SUZHOU LTO TRADE CO. LTD at address Room
1818 I Zhoungliang Xiangt I, Suzhouhuqiu Juangsu, China.  The shipment
was manifested as 'Epoxy Resin'.  CBP's examination of the shipment
yielded a plastic bag containing a pink colored substance.  A sample of the
substance was tested by the CBP laboratory and tested positive for
Ethylone, Schedule I.  The net weight of the substance was 522 grams.

iii.    On November 10, 2014, CBP Officers in Anchorage, Alaska inspected a
package destined for an address in Carteret, New Jersey.  The package
originated from the SUZHOU LTO TRADE CO. LTD. at address 1818 I
Zhoungling, Suzhou, China.  The shipment was manifested as 'Epoxy
Resin'.  CBP's examination of the shipment yielded two (2) foil
envelopes.   One foil envelope contained a clear plastic bag wrapped in

carbon paper containing an off-white in color granular substance. The other foil envelope contained a black plastic packet labeled "Dylon dark brown fabric dye" and contained a brown rock like substance. A sample of each substance was field-tested by CBP and tested positive for Methylone, Schedule I. The net weight of the substance was 1.0166 kilograms.

iv. On February 06, 2015, CBP Officers in Jamaica, New York inspected a package destined for an address in LaGrange, Georgia. The package originated from the SUZHOU LTO TRADE CO. LTD at address 1818 I Zhongliang Xiangt, Suzhouhuqiu Jiangsu, China. The shipment was manifested as 'Non Haz Chemical Sample'. CBP's examination of the shipment yielded one (1) aluminum foil bag containing a crystalline substance. A sample of the substance was tested by the CBP laboratory and tested positive for Ethylone, Schedule I. The net weight of the substance was 252 grams.

v. On March 03, 2015, CBP Officers in Memphis, Tennessee inspected a package transiting the United States destined for an address in Apucarana, Brazil. The package originated from the SUZHOU LTO TRADE CO. LTD at address Rm. 1818 Zhongliang Xiangt No. 7, Suzhou, China. The shipment was manifested as 'Potassium Formate'. CBP's examination of the shipment yielded an 'unknown substance'. A sample of the substance was tested by the CBP laboratory and tested positive for Ethylone, Schedule I. The net weight of the substance was 125 grams.

vi. On March 05, 2015, CBP Officers in Chicago, Illinois inspected a package destined for an address in Flora, Illinois. The package originated from the SUZHOU LTO TRADE CO. LTD. at address Zhongliang Xiangt 1 No, Jiangsu, China. The shipment was manifested as 'Potassium Formate'. CBP's examination of the shipment yielded white and brown crystalline material. A sample of both substances was tested by the CBP laboratory

3:15 MJ 5180

and tested positive for Alpha-PVP HCl, Schedule I. The net weight of both substances was 1.0163 kilograms.

vii. On March 06, 2015, CBP Officers at JFK International Airport (New York, NY) inspected a package destined for an address in Detroit, Michigan. The package originated from the SUZHOU LTO TRADE CO. LTD at address Room 1818 1 Zhongliang Xiangt, Suzhouhuqiu Jiangsu, China. CBP's examination of the shipment yielded a clear plastic bag with a white crystalline substance inside of a foil pouch. A sample of both substances was tested by the CBP laboratory and tested positive for Ethylone, Schedule I. The net weight of the substance was 490 grams.

viii. Also on March 06, 2015, CBP Officers at JFK International Airport (New York, NY) inspected a second package destined for an address in Jacksonville, Florida. The package originated from the SUZHOU LTO TRADE CO. LTD at address Room 1818 1 Zhongliang Xiangt I N, Suzhouhuqiu Jiangsu, China. CBP's examination of the shipment yielded a clear plastic bag with a white crystalline substance inside of a foil pouch. A sample of both substances was tested by the CBP laboratory and tested positive for Alpha PVP, Schedule I. The net weight of the substance was one (1) kilogram.

12. On March 27, 2015, your affiant conducted open-source social media research surrounding the online identities of Kaylin Plontz. The search resulted in multiple suspicious social media communications via popular social media platforms Twitter and Facebook.

13. On August 16, 2014, Kaylin Plontz, using Twitter ID @PixieDustSpark, posted the following:

a. 'Got in my ribbon shipment, there is 1,500 feet of ribbon here total.'

Affiant is unaware of whether "ribbon" is slang for and/or code for an illegal and/or scheduled drug but the timing of this internet post coincides with the importation of the parcel recording in CBP systems on August 5, 2014 (See paragraph 8.b.i).

3: 15 MJ 5180 ¹

14. Finally, on August 28, 2014, Kaylin Plontz posted to her Facebook page that she was married to Stephen HANSEN (see paragraph 8.b.i.).

15. Your affiant observed photographs of Kaylin PLONTZ and Stephen HANSEN on Kaylin PLONTZ's Facebook and Twitter accounts. I compared these images to the photograph on each of their driver's licenses issued by the State of Ohio and found them to match their respective driver's license photograph.

16. On March 30, 2015, your affiant conducted research through law enforcement databases and learned that Stephen HANSEN (DOB:          SSN:          ) is issued Ohio driver's license number        with a listed address of        Mandell Road, Perrysburg, Ohio 43551-3774. Stephen HANSEN has no criminal history.

17. An anticipatory search warrant was obtained on April 1, 2015 for        Mandell Road, Perrysburg, Ohio 43551-3774. On April 2, 2015, an undercover postal inspector, posing as a delivery person, made a controlled delivery of the package to        Mandell Road, Perrysburg, Ohio 43551-3774. Inside the package was a device that would signal to Agents when the package was opened. Of the 1.02 kilograms of Methylenedioxypuyrovalerone (MDPV, Schedule I) originally intercepted in the package, Agents removed all but 200 grams of the drug from the package prior to the controlled delivery.

18. At the time of the controlled delivery, Kaylin PLONTZ was present inside, answered the door, and accepted said package. Following acceptance of the package, Agents then executed the search warrant and recovered the package inside the residence. They found no other controlled substances or evidence of drug operations. PLONTZ did not open the package. She and two young children were the only ones in the home at that time.

19. Kaylin PLONTZ denied knowledge of drugs inside the package in question but admitted that she had received this package and several other packages in the past at        Mandell Road, Perrysburg, Ohio 43551-3774, that all of them were for her mother, DANYA SCAVO, and her mother's business, and that her mother ran a company that sells weight loss and sports supplements. Kaylin told Agents that although she did not know the exact address, she knew where her mother lived, that it was on The Bluffs, that it was in Toledo, that it was in a private community, and that her mother rents the property.

3 : 15 M J 5180

20.     Kaylin PLONTZ'S husband, Stephen HANSEN, arrived at ▮ Mandell Road, Perrysburg, Ohio 43551-3774 after execution of the search warrant and while Agents were still on the scene. HANSEN also denied knowledge of any drugs in packages sent through the mail. He admitted that he and Kaylin Plontz had received packages at that residence for Kaylin's mother, DANYA SCAVO, in the past for which he and Kaylin received money from DANYA each month. HANSEN also told Agents that DANYA SCAVO owned a company that sells weight loss and sports supplements, that she would order chemicals from China, that he knew some of those chemicals were white powders, and that DANYA would then resell them to businesses across the United States. Although he did not know the address of DANYA SCAVO'S residence, he told Agents he knew where she lived and could show them where it was located. HANSEN also told Agents that DANYA SCAVO also had a separate address for her business and that it was on Indiana in Perrysburg, Ohio. HANSEN went in one of the Agent's vehicles and directed Agents to the location of DANYA SCAVO'S residence, which was ▮ The Bluffs, Toledo, Ohio 43615, located in a private community.

21.     Affiant checked his agency's public records database vendor and found that ▮ The Bluffs, Toledo, Ohio 43615 has been associated with DANYA SCAVO since April 29, 2014.

22.     Agents set up a controlled delivery of the package to DANYA SCAVO by Stephen HANSEN by having Kaylin Plontz send DANYA SCAVO a text, telling her that HANSEN would be delivering the package later this evening of April 2, 2015. DANYA SCAVO responded via text that she was home and that Stephen could drop off the package.

23.     On April 2, 2015, Special Agents from HSI Cleveland, a United States Postal Inspector and Stephen HANSEN performed a controlled delivery of the package to ▮ The Bluffs, Toledo, Ohio, 43615. Agents removed all drugs out of the package prior to delivery. The package was accepted by an individual identified to Agents by HANSEN as Kaylin PLONTZ's grandmother, Darlene DELUCIA, and transported within this location.

24.     Continuing on April 2, 2015, the aforementioned Special Agents executed a search warrant at ▮ The Bluffs, Toledo, OH 43615. Seized as a result of the search warrant execution were approximately twenty one (21) kilograms of suspected controlled substances,

3 ° 1 ⁵ M J 5180 ¹

including powders, crystals, and respective packaging, as well as laboratory equipment, food-grade cutting and mixing substances, computers and hard-drives, and printed documents.

25.    The seized substances were found in bulk packaging as well as individual packages prepared for delivery. Laboratory analysis conducted by the Drug Enforcement Administration North Central Laboratory in Chicago, Illinois indicated that a portion of the seized substances tested positive for the following schedule one (1) controlled substances:

      b.   Quinolin-7-yl 1-pentyl-1H-indole-3-carboxylate (PB-22)

      c.   Pentedrone Hydrochloride

      d.   α-Pyrrolidinovalerophenone (α-PVP) hydrochloride

## EMAIL COMMUNICATION BETWEEN DANYA SCAVO & RYAN JARCY

26.    During a review of printed documents located at ▮▮▮▮ The Bluffs, Toledo, OH 43615 your affiant located the following two communications between pacificresearch@riseup.net (an email address known to be used by Danya SCAVO) and ryanjarcy@gmail.com:

      e.   Date: August 15, 2014, 7:31 PM

The first line of the printed email indicated that it was sent with PGP encryption. The email string began on August 8, 2014 at 3:36 PM were SCAVO provided prices for sixteen (16) substances detailed as follows:

| | |
|---|---|
| Substance: #5: PB-22 | 5g: $400.00 |
| 100mg: NA | 10g: NA |
| 1g: $60.00 | 25g: NA |
| 5g: $90.00 | 50g: NA |
| 10g: $160.00 | 100g: NA |
| 25g: $350.00 | 250g: NA |
| 50g: $550 .00 | 500g: NA |
| 100g: $1000.00 | 1kg: NA |
| 250g: $2250.00 | |
| 500g: $4000.00 | Substance: #7: 25C-nbome |
| 1kg: $6000.00 | 100mg: NA |
| | 1g: $100.00 |
| Substance: #6: 25B-nbome | 5g: $400.00 |
| 100mg: NA | 10g: NA |
| 1g: $100.00 | 25g: NA |

50g: NA
100g: NA
250g: NA
500g: NA
1kg: NA
Substance: #9: PV-8
100mg: NA
1g: $ 60.00
5g: $90.00
10g: $160.00
25g: $350.00
50g: $550 .00
100g: $1000.00
250g: $2250.00
500g: $4000.00
1kg: $6000.00

Substance: #14: 5-MAPB
100mg: NA
1g: $60.00
5g: $210.00
10g: $400.00
25g: $925.00
50g: $1700 .00
100g: $3100.00
250g: $5250.00
500g: $7000.00
1kg: $9000.00

Substance: #15: 2-FA
100mg: NA
1g: $60.00
5g: $120.00
10g: $220.00
25g: $500.00
50g: $900 .00
100g: $1500.00
250g: $3000.00
500g: $5000.00
1kg: $7500.00

Substance: #17: DOC
100mg: NA
1g: $60.00
5g: $170.00
10g: $320.00

25g: $750.00
50g: $1400 .00
100g: NA
250g: NA
500g: NA
1kg: NA

Substance: #19: 4f-PVP
100mg: NA
1g: $60.00
5g: $120.00
10g: $220.00
25g: $500.00
50g: $900 .00
100g: $1500.00
250g: $3000.00
500g: $5000.00
1kg: $7500.00

Substance: #20: 3-meo-pcp
100mg: NA
1g: $60.00
5g: $20.00
10g: $220.00
25g: $500.00
50g: $900 .00
100g: $1500.00
250g: $3000.00
500g: $5000.00
1kg: $7500.00

Substance: #21: MXE
100mg: NA
1g: $60.00
5g: $140.00
10g: $200.00
25g: $460.00
50g: $850 .00
100g: $1400.00
250g: $2900.00
500g: $5000.00
1kg: $7500.00

Substance: #25: F-FA
100mg: NA
1g: $60.00

3:15 MJ 5180

5g: $170.00
10g: $240.00
25g: $510.00
50g: $860 .00
100g: $1400.00
250g: $2700.00
500g: $4900.00
1kg: $7500.00

Substance: #28:  A-PVP
100mg:  NA
1g: $60.00
5g: $120.00
10g: $220.00
25g: $500.00
50g: $900 .00
100g: $1500.00
250g: $3000.00
500g: $5000.00
1kg: $7500.00

Substance: #32:
ABCHMINACA
100mg:  NA
1g: $60.00
5g: $100.00
10g: $180.00
25g: $400.00
50g: $700 .00
100g: $1200.00
250g: $2200.00
500g: $3250.00
1kg: $4800.00

Substance: #34:  4-BMC

100mg:  NA
1g: $60.00
5g: $170.00
10g: $240.00
25g: $510.00
50g: $860 .00
100g: $1400.00
250g: $2700.00
500g: $4900.00
1kg: $7500.00

Substance: #36:  5f-SBD-005
100mg:  NA
1g: $60.00
5g: $100.00
10g: $180.00
25g: $400.00
50g: $700 .00
100g: $1200.00
250g: $2200.00
500g: $3250.00
1kg: $4800.00

Substance: #37:  4-meo-pcp
100mg:  NA
1g: $60.00
5g: $120.00
10g: $220.00
25g: $500.00
50g: $900 .00
100g: $1500.00
250g: $3000.00
500g: $5000.00
1kg: $7500.00

On August 15, 2014 at 8:09 am JARCY responded asking SCAVO if she wanted to offer 2kg prices at double that of the 1kg price.  He further stated that he was working on SCAVO's shopping cart/checkout process and needed her input on how she wanted to process payments.  This portion of the email was also marked as PGP encrypted.

3:15 MJ 5180

On August 15, 2014 at 9:11 am SCAVO responded stating that she did not want a 2kg option, and if a client wanted to order more than one kilogram they could use the quantity function in the 1kg field.

On August 15, 2014 at 7:31 PM JARCY responded stating that he was finalizing the order/payment/cart system and wanted to clarify a few points including:

User registration and access

How credit cards will be processed.  JARCY specifically mentions 'through the boutique'

Order, shipping, and inventory management specifically mentioning a USPS label plugin

JARCY proposed the following workflow for SCAVO:

Order is placed>email of order sent to you for verification and fulfillment>order fulfilled, CC processed through boutique>order closed on backend and inventory updated

f.  Date:  December 29, 2014, 8:49 PM

Subject:  order up!  86 the mistakes!

1g #3 **

3g #14

5g #15

2g#24.2 (compound does not test well in H2O according to Dr. Washing Machine and This Forgetful Non-Pocket-Check Idiot Right here)

5g #32

5g #4

3x #35 (2g of it as powder if it's in) **

5-10g #28 (down to buy at least 1/4 kg if you are still up for it at the Special Web Dev Faggot price- can do full price for <250g)**

3 ∘ 15 M J 5180

any amount of 12 and 13

** = would LOVE to get more (only if you have a buttload extra sitting around) but i'm already swimming in kindness and surprise presents

thank you, thank you, thank you time infinity. don't know how you do you so well aboard a pirate ship, but I dig it like a grave!

-Schmoopie

FINANCIAL TRANSACTIONS BENEFITTING RYAN JARCY

27.     Your affiant analyzed financial records provided by Huntington Bank for business checking account ending -0181. The signature card for account ending -0181 indicates that the business checking account is titled LA VITA BELLA, LLC. The two (2) signers on the account are Danya SCAVO and Darlene DELUCIA; both persons are designated as President/Owner/CEO. The signatures are dated January 21, 2014. Your affiant further analyzed checks posted against the account, and observed that between August 12, 2014 and November 28, 2014 Ryan JARCY received $10,200 via seven (7) checks ranging in amounts from $500.00 to $2,200.00.

IDENTIFICATION OF RYAN JARCY

28.     On June 30, 2015 an HSI/Cleveland Intelligence Research Specialist (IRS) conducted research regarding the email address ryanjarcy@gmail.com. As a result of this research a weblog ('blog') site was located at https://ryanjarcy.wordpress.com/ where email address ryanjarcy@gmail.com was provided as a method by which to contact the author. A review of the blog posting revealed a detailed account of how JARCY accidentally discharged a twelve-gauge shotgun into his leg sometime in 2012 within close proximity to his 26th birthday. Also in the blog posting he identifies himself as a resident of the Midland, Texas area.

29.     The HSI/Cleveland IRS continued conducting research through a reputable public records vendor and located Edward Ryan JARCY with a date of birth of ▮▮▮▮▮▮ and a credit record header history placing him at address ▮▮▮▮▮▮▮▮▮▮, Midland, TX 75002.

AVAILABILITY OF RECORDS

3:15 MJ 5180

30.     18 USC 2703(f) provides that a provider of wire or electronic communication services must, at the request of a governmental entity, preserve records under their control for 90 days after receiving said request.  This request can be extended for an additional 90 days at the request of the governmental entity.

31.     On April 14, 2015 SA Gibson issued a Preservation Request Letter to Google, Inc. for the preservation of electronic communication for gmail account ryanjarcy@gmail.com. On July 6, 2015 SA Gibson sent a second request to Google, Inc. extending the preservation request an additional 90 days.

32.     In general, an email that is sent to a Google, Inc. subscriber is stored in the subscriber's "mail box" on Google, Inc.'s servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Google, Inc.'s servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google, Inc.'s servers for a certain period of time.

## BACKGROUND CONCERNING EMAIL

33.     In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public.  Google, Inc. allows subscribers to obtain email accounts at the domain name gmail.com, like the email account[s] listed in Attachment A.  Subscribers obtain an account by registering with Google, Inc.  During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc.'s services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

34.     A Google, Inc. subscriber can also store with the provider files in addition to emails, such as address books, contact or 'buddy' lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google, Inc.  In my training and experience, evidence of who was using an email account may be found in address

3 : 15 M J 5180

books, contact or 'buddy' lists, email in the account, and attachments to emails, including pictures and files.

35.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provides clues to their identity, location or illicit activities.

36.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

37.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

3 ' 15 M J 5180 '

38.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

39.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, Inc. who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

3 : 15 M J 5180

40.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

s/ David J. Gibson

David J. Gibson
Special Agent
Homeland Security Investigations

SWORN AND SUBSCRIBED TO BEFORE ME (VIA TELEPHONE) THIS 22ND DAY OF JULY, 2015

Honorable James R. Knepp, II
United States Magistrate Judge

Page **21** of **25**